UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                    *Plaintiff*,

       vs.                                   **Case No:  15-CR-00149-001(RJA)**

FRANK R. PARLATO, JR.,

                    *Defendant.*

_____

### FRANK R. PARLATO, JR.'S SENTENCE MEMORANDUM, LETTERS IN AID OF SENTENCING AND STATEMENT REGARDING SENTENCING FACTORS

DATED:      Buffalo, New York
              March 12, 2022     Respectfully submitted,

                                    PAUL J. CAMBRIA, JR,, ESQ,
                                    Attorney for Defendant
                                    FRANK PARLATO
                                    42 Delaware Avenue
                                    Buffalo, New York 14202
                                    (716) 849-1333
                                    pcambria@lglaw.com
                                    hgreenman@lglaw.com

TO:    MICHAEL DIGIACOMO, ESQ.
        CHARLES M. KRULY, ESQ,
        ASSISTANT UNITED STATES ATTORNEYS
        138 Delaware Avenue
        Buffalo, New York 14202

## PRELIMINARY STATEMENT

On August 5, 2022 Frank R. Parlato, Jr. appeared before Senior United States District Judge Richard J. Arcara, waived Indictment, and pled guilty to a one count Superseding Information which charged him with Willful Failure to File Returns Involving Cash Transactions of more than $10,000.00 in violation of Title 26 USC §7203 and 26 USC §60501 (a Form 8300) for conduct occurring on or about April 10, 2010, through on or about July 31, 2010. Among other agreements set forth in a written Plea Agreement entered into between Mr. Parlato and the Government, it was agreed that all of the counts contained in the Superseding Indictment will be dismissed at the time of Mr. Parlato's sentence.

A Presentence Report has been prepared by the United States Probation Department for the Western District of New York. Previously, counsel, on behalf of Mr. Parlato, filed Objections to the Presentence Report. The Government has filed a Response.

By this memorandum, Mr. Parlato does not wish to formally contest all of the suggestions/allegations contained in the Presentence Report. It should be noted, however, that Mr. Parlato, who vigorously prepared for trial before Judge Arcara, has forcefully denied the allegations contained in the Superseding Indictment. As the trial date approached through the summer of 2022, both the Government and Mr. Parlato engaged in substantial plea negotiations in an effort to resolve this case that had the potential for being a two month or so trial.

As to the background of the case, the Probation Department has seen fit to discuss in large part in the Presentence Report allegations that were contained in the Superseding Indictment. We do not wish to relitigate all of those issues, but through this memorandum, we hope that the Court will be able to see that the allegations contained in the Presentence Report would not have been successful at trial. However, as indicated, we do not wish to relitigate all of the issues set forth

therein. This case has spanned over 11 years (seven years of Indictment/four years of preindictment investigation), and Mr. Parlato fought hard to prove his innocence as it related to the Indictment allegations.

In the Plea Agreement and through the plea process before the Court, Mr. Parlato and the Government made it clear that Mr. Parlato was pleading guilty **only** to the allegations contained in the Superseding Information and **not** to any of the allegations contained in the Indictment. So that it is clear, Mr. Parlato's crime of conviction was set forth in paragraphs 82 and 83 of the Presentence Report and are reflected in the Plea Agreement.

In sum and substance, vendors who did business at One Niagara agreed to rent space at the building. Mr. Parlato and others collected rent from the vendors on a daily or weekly basis. The allegations indicated that Vendor 1 operated a food stand at the One Niagara building and agreed to pay 25% of his gross sales on a daily or weekly basis for rent. In 2010, approximately 12 years ago, Vendor 1 paid Mr. Parlato approximately $19,970.00 in rent. The money came from a legitimate source. After collecting the rent, the money was deposited into a business bank account. Mr. Parlato has admitted that he failed to file an IRS Form 8300 with regard to the receipt of cash for the 2010 summer season, which exceeded over $10,000.00. Mr. Parlato's crime of conviction came as a result of failing to file the appropriate IRS Form, which was required when the aggregate cash collected exceeds $10,000 in one year. Because the cumulative amount of rent collected in cash was $19,970.00 in 2010, Mr. Parlato has agreed that he was obligated to file the IRS Form 8300 even though the cash had been obtained legally and Mr. Parlato reported the entire sum as income on appropriate IRS tax returns. Mr. Parlato has fully accepted responsibility for his failure to file the form in 2010.

Mr. Parlato, however, has adamantly denied most of the allegations contained in the

Presentence Report. We will attempt to address some of those issues, but we believe that it would be a waste of this Court's valuable time and resources to relitigate all of the issues contained in the Superseding Indictment, which will be dismissed upon Mr. Parlato's sentence.

As will be seen below, Mr. Parlato is nearly 68 years old and in declining health. He has lived under a cloud of the investigation, the initial Indictment, and Superseding Indictment for 11 years. We ask the Court to fashion a sentence that will allow Mr. Parlato to continue his work in the community without the need for a sentence involving incarceration. In doing so, we ask the Court to consider his vast charitable and benevolent works as are reflected in many of the letters attached hereto. For those reasons, we will ask the Court to sentence Mr. Parlato accordingly.

### BACKGROUND TO THE ALLEGATIONS AGAINST MR. PARLATO

Mr. Parlato's involvement with the building known as One Niagara began many years ago. The building, located at 360 Rainbow Blvd. in downtown Niagara Falls, was a 9-story office building built for a substantial amount of money and was opened as the local offices of the Hooker Chemicals and Plastics Corporation. The building, which sat across the street from the Rainbow Mall in Niagara Falls and faced the Niagara Falls New York State Park and the Rainbow International Bridge to Canada, was a one-of-a-kind structure. However, by the end of the 1990s, Hooker Chemical had moved most of its operations to Texas, and the building sat empty.

In 1999, a Hong Kong businessman, David Ho, purchased the building for five million dollars from Hooker Chemicals, which held a $3.5 million first mortgage. Ho's desire was to turn the building into an underground aquarium which he referred to as 'AquaFalls.' The project was estimated to cost approximately $35 million and involved underground observation areas. Initially, Ho planned to dynamite a hole in the ground approximately 290 feet long, 150 feet wide, and 40 feet deep in the front lawn of the building, about 1200 feet from the brink of the American

Falls. The hole, which was dug at great expense, caused damage to the building itself and within a short time destroyed the energy efficiency features of the building. However, once the hole was dug/excavated, further construction on the underground aquarium project stopped. Shortly thereafter, Ho stopped paying the first mortgage to Hooker Chemicals. It was then that Ho borrowed a substantial amount of money from Reger Investment Funds, LTD, a business owned and controlled by Lawrence Reger, a local businessman. The money invested by Reger was secured by a second mortgage on the property. Ho used the money to pay the contractors for the hole excavation.

As time passed, other work was done to transform the hole into an aquarium. Rather, as years passed, the hole remained fenced and was considered a blight to the entire area. Sometime after Ho stopped paying the first mortgage, Hooker Chemicals agreed to discount its mortgage, and Ho, through one of his companies, bought the first mortgage.

Although Ho paid Hooker $1.5 million for the mortgage, he credited himself the $3.5 million (undiscounted value of the mortgage), plus back interest, late fees, and penalties. He valued the first mortgage (which he now owned) at $6.8 million. He continued to default on the Reger mortgage.



*The size of the hole can be seen by observing the cars on the street.*

By 2004 the hole had been excavated for five years. Local journalists wrote about it and the City of Niagara Falls sued Ho's company, claiming the hole was endangering pedestrian safety as a result of collapsing sidewalks, together with deteriorated metal fences.

Mr. Reger won a judgment of foreclosure on his second mortgage loan, which now, with interest, penalties, and legal fees, was $3.5 million. He began proceedings for the property to be sold at auction. But Reger only held a second mortgage. The first mortgage, inflated by Ho to $6.8 million, was greater than the actual market value of the property. Additionally, by the terms of the first mortgage, Ho, as the first mortgagee, was contractually permitted to collect any rents from the building. Even if Mr. Reger, as second mortgagee, forced the sale of the property through a foreclosure auction, whoever successfully bid at the foreclosure auction could have title to a building with its hole, but Ho, as first mortgagee, was entitled to collect the rents until the new owner satisfied his $6.8 million first mortgage.

Meanwhile, the hole became increasingly noticed and talked about. The Buffalo News wrote, "the locally and infamous hole in the ground, dug in front of the former Occidental Chemical Center in 1999 has never been filled with anything, much less the…aquarium a group of international investors promised."

### The Acquisition of the Building by Mr. Parlato

In October 2004, Ho's attorney introduced him to Mr. Parlato. As noted above, the property was in crisis.  On top of that, the last remaining tenant was moving out and the nine-story building would be empty. Reger had begun foreclosure proceedings, but had postponed several auction dates and the property taxes were accruing on a $1000-per day basis. Ho asked Mr. Parlato for a $23,000 loan to cover one month's interest to be paid to Mr. Reger. Reger and Ho were increasingly hostile to each other because Reger lent millions in good faith on the promise made to him by Ho (and Ho's local partners) that Ho was a wealthy businessman who knew what he wanted to do, had the financing to build the aquarium and repay the Reger loan. But in and of itself, Reger's mortgage was not worth anything. Ho was also in danger of losing the property as the hole was increasingly perilous, the sidewalks continued to collapse, and people could literally fall into it. The possibility existed, according to the City, that the street - Rainbow Blvd itself - might be undermined and fall into the hole. The City of Niagara Falls began condemnation and Ho's company began accumulating heavy daily fines. None of this personally affected Ho, nor did he see the results of his disastrous management, for he was residing in Hong Kong.

Mr. Reger agreed to assign Mr. Parlato his second mortgage in order to attempt to stop the foreclosure. Mr. Parlato negotiated with Ho to move Mr. Reger's mortgage to a first position and make Ho's mortgage a second mortgage. Thus, instead of foreclosing and getting nothing in return,

Reger would be paid first if Mr. Parlato could develop the vacant building and find a way to fill the hole.

Mr. Parlato formed an LLC with Ho, sparing him from foreclosure and saving his investment. It was then that Mr. Parlato had to find a way to develop the property.

In November, 2004 One Niagara LLC was formed with David Ho (Incredible Investments) as limited member and Frank Parlato (Whitestar LLC) as managing member of One Niagara LLC and entered into an operating agreement granting Mr. Parlato sole managing authority of the property. Ho, as a limited partner, had no managerial rights. Ho had shown himself to be incapable of managing the property.

In order to clear title, Mr. Parlato, as assignee of the original Reger second mortgage, held a foreclosure auction. One Niagara LLC was the sole bidder. Though the property was high profile, and advertised as going up for auction and was in an excellent location, no one else bid in. Developers saw the property as basically worthless or in its condition, with the dangerous hole, too risky a development.

One Niagara LLC became the title owner of the building, the grounds and the hole. Mr. Parlato renamed the building One Niagara and announced plans to convert the office building into a tourist center. Without going into great detail, Mr. Parlato saw the building as a perfect place to develop tourism traffic. It was close to the Falls and adjacent to the State Park. With the right amenities, it could help to keep tourists in the Niagara Falls New York area. Shortly after the purchase of the property, Mr. Parlato was able to fill in the huge hole in front of the building. The building stood in the center of an otherwise closed down area. Mr. Parlato was viewed by many as a hero because no one had the funds or was willing to risk the capital to develop the property let alone fill in the gigantic hole.







By April, 2005 Mr. Parlato was responsible for filling in the hole with about 50,000 cubic yards of clay-rock fill. He was then prepared to start to develop the building. This time local media lauded the work done at the building. A local radio station suggested "a gaping 40-foot hole in the heart of downtown Niagara Falls is finally being filled. The removal means a blight that greeted people as they entered the City from the Rainbow Bridge will be no more." Another media outlet, when it learned that Mr. Parlato was filling in the hole and was going to use it as a parking lot together with the separate development of the building itself, recognized that "on this side of the border… it's a pretty big development."

**Reger's Role and Further Development**

In 2006, Reger Investments loaned a substantial amount of money in two installments for the renovation of the property. In return, Mr. Reger obtained 50% of a 30-year leasehold on the first floor and 9th floor (later amended to the 2nd floor) of the building, and the parking lot. Together, Mr. Parlato and Mr. Reger formed Tourist Services LLC. Mr. Parlato, as manager of One Niagara LLC, had the complete authority to manage the property as he saw fit. One Niagara LLC entered into an agreement to lease to Tourist Services LLC the first floor and parking lot.

Tourist Services paid 25% of the annual gross revenue as rent, which was fair market rent for Niagara Falls tourist businesses. Additionally, it was agreed that starting in year three of the lease, Mr. Reger would either receive at least a $200,000.00 annual distribution or he would have the option of co-managing the property with Mr. Parlato. With the money Mr. Reger lent to Tourist Service, Mr. Parlato converted the first floor lobby and offices into a 17,000 square foot retail area which included a welcome center, a large food court, and an array of retail stores, together with sightseeing tour buses leaving from the property hourly during the peak season. Mr. Reger's loan to Tourist Services LLC was repaid with interest within two years. Mr. Reger was not called to invest any additional money or devote any time toward the project. With no management duties and his entire investment repaid by 2008, Mr. Reger received his $200,000.00 every year from 2009 until he passed away in 2015. His heirs continue to receive profits every year to this date from the business Mr. Parlato developed.





Today, One Niagara is a long-established success story, with its owners reaping substantial profits from Mr. Parlato's early efforts. But in the early years, Mr. Parlato faced considerable difficulties. For the first four years, there was no guarantee of success. Mr. Parlato had to establish every business and overcome a number of challenging factors. This is not the place to describe it in detail, but Mr. Parlato developed a successful business venture, using local small business

12

owners as vendors and in this way created success stories for local people in a depressed economy, and remove a substantial blight from downtown Niagara Falls, New York.

Contrary to what was suggested in the Indictment, Mr. Parlato did not defraud Mr. Reger. In fact, just 13 days before he passed away in March 2015, Mr. Reger testified at a trial in New York State Supreme Court. Under oath, he averred that he believed that Mr. Parlato had not stolen anything from him.

But back in 2007, when the development was new and the end results were in no way guaranteed, every small step came with a cost. In 2007, the food court had been completed and the parking lot was paved. There had been substantial expenses to begin development of the property. There was much more to be spent. Mr. Parlato was determined to use the revenue from the businesses to make improvements and not borrow money. It seemed that enough income could be generated in the future to make the project a success. Mr. Parlato was able to attract tourists into the building through his own style of marketing and promotion, which included arranging with national bus tour companies to bring their customers to the building and through other creative methods including competing directly for parking with the State Park.

Local media reported on the results, writing that "the first-floor bustles with food stands and souvenir vendors. A 40-foot excavation has been filled and is a paved parking lot that fills nearly daily."

Mr. Parlato, observing that the American side of the falls had no views of the falls outside of the State Park, opened the ninth floor of One Niagara to provide tourists with a free panoramic view of the Falls, the Niagara Gorge and the Upper Rapids. Once again, local media called it "a good sign," recognizing the benefits which would inure to the downtown area.

13

Attorney Ralph Lorigo, who was familiar with the building, the improvements made, and the litigation, summed it up in his letter of support: "[Mr. Parlato] was able to put that property to economic use after it had been salvaged by prior owners."

Journalist Tony Farina, who worked for the project in a senior role, wrote in a letter of support: "When [Mr. Parlato] took over the One Niagara building next to the Rainbow bridge, it was in a state of complete disrepair with a whale-sized hole …he filled the hole, invited businesses in to set up shop including a tourist booth, and made it a success."

Another reliable witness is J. Gary DiLaura, who, for 20 years, has been the Chairman of the Niagara Falls Board of Assessment Review. A longtime resident of Niagara Falls and whose distinguished career as an FBI Special Agent for almost 30 years is well known, Mr. DiLaura wrote in his letter of support: "These [Aqua Falls] developers, including an investor from China [Ho], promised to build an underground aquarium. Instead, they salvaged the building, ripped everything out that was of any value, and dug this great big hole as a distraction. Then Frank Parlato came in, and he filled that hole back up again. I don't know how he did it, but he did it at his own expense. He brought that building back to life again. Now it's back on the tax rolls, paying substantial taxes. The people of Niagara Falls owe Mr. Parlato a debt of gratitude for that."

**Shmueli and Years of Litigation**

David Ho, who had been absent from the project for a lengthy period of time, came from Hong Kong for a visit in July 2007. The man who had left the building in disarray and near abandonment, leaving a raft of unpaid creditors and a gaping hole, now saw that the hole was filled, the parking lot was filling up daily, and tourists were being coaxed to come in the door and explore what the building had to offer. Indeed, many improvements had occurred since Ho last saw the property.

14

On July 12, 2007, Ho, now that the building appeared to be on its way to success, demanded he now have a say in how the management was undertaken. He informed Mr. Parlato that he had no right to lease any of the property to a company that Mr. Reger had an interest in. Mr. Parlato reminded Ho that the operating agreement gave him, Mr. Parlato, full and exclusive management control.

Shortly afterward, Ho introduced Mr. Parlato to Shmuel Shmueli, an Israeli national, whom Ho claimed was his proxy and agent. Ho left, apparently never to return to the building.

Shmueli, now acting as Ho's representative, began to make exceesive and ever-changing demands for records. To provide Shmueli with what he wanted in the timeline he demanded, Mr. Parlato would have to drop everything during the busiest time of the short (100 day) peak tourist season.

Mr. Parlato asked Shmueli to wait a month until the peak season was over and he would spend as much time as needed to provide everything Shmueli requested. Shmueli refused.

On August 16, 2007 when Mr. Parlato was away for a day, Shmueli attempted to take over the operation of the building. He called what was an illegal One Niagara LLC members' meeting in violation of the operating agreement. Shmueli conducted his mock members' meeting with only himself, a stenographer and attorney, and, with a vote of one, elected himself as the new managing member in Mr. Parlato's absence. He passed a resolution not only appointing himself sole managing member, he demoted Mr. Parlato to "Superintendent of Building and Grounds." He also passed a resolution authorizing him to change the locks on the property.

Following that fictitious meeting, Shmueli told the vendors and tenants that he was the new manager at One Niagara and they were to pay him rent. Mr. Parlato had to visit all of the vendors

15

in an attempt to convince them that Shmueli's suggestions about his authority were false. In truth, Shmueli wanted Mr. Parlato to set aside Reger's lease.

In a not too subtle way, Shmueli threatened Mr. Parlato and told him he would begin continuous and costly litigation against him and that it would cost far more money to keep Mr. Reger's lease, than to oust him, with Shmueli's help, by canceling the lease. Mr. Parlato refused.

That began eight years of litigation.

As part of the litigation process, Mr. Parlato won a preliminary injunction in New York State Supreme Court prohibiting Shmueli from holding himself out as manager, removing locks and taking other adverse actions against the building.  But that did not stop Shmueli. He appealed the decision and brought actions in US District Court and in State Court. Shmueli sued Mr. Parlato and Mr. Reger approximately 10 times. (Among the Judges whom Shmueli appeared before as part of his years-long litigation against Mr. Parlato, Mr. Reger and One Niagara were State Supreme Court Justices Frank Caruso, Frederick Marshall, Ralph Boniello, Deborah Chimes, Richard Kloch, and Timothy Walker, US Magistrate Judge Jeremiah McCarthy, and US District Court Judge William M. Skretney.)

On top of the development costs, the legal expenses were significant. Mr. Parlato estimates that it cost he and Mr. Reger over $1 million to defend against the fictitious and ultimately failed lawsuits.

Though a preliminary injunction was in place, Shmueli continued to interfere with the manner in which the business was run. He spread rumors about Mr. Parlato. He would slide anonymous letters and court records under newspaper doors.  Within a short time, Mr. Parlato understood what Shmueli was trying to do. He not only wanted to exclude Mr. Reger but to oust Mr. Parlato.

Mr. Parlato advised Reger that it would be prudent to move some of the Tourist Services' money to a separate bank account because Shmueli's acts were unpredictable. Simply put, he feared that Mr. Shmueli would obtain a type of seizure order. Nearing the end of the summer tourist season, with Mr. Reger's approval, Mr. Parlato caused money to be transferred out of the Tourist Services' account to a company Shmueli was unfamiliar with, Johnston and Peach Inc. Mr. Parlato did **NOT** do so to hide money from the IRS but to make sure the business had the reserves needed to remain operational, by avoiding Shmueli's reach. An email, (in possession of the Government) shows Mr. Reger's bookkeeper was provided the password to the account.

But  Shmueli was relentless. Over the years, he retained more than 35 lawyers in a virtual revolving door of attorneys. Shmueli, who often posed as Rabbi, would retain attorneys by misrepresenting to them that he represented the "billionaire" David Ho. He would then make a substantial retainer payment, and just as Ho dug a hole and did no more, Shmueli would get competent, zealous attorneys engaged in legal actions then never replenish the retainer.

Among the lawyers and law firms retained and who departed, often with fees unpaid, or after becoming aware of Shmueli's dishonest approach to litigation were Joseph Zdarsky, David Gutkowki, Steven Cohen, Corey Hogan, John LaFalce, (Jaeckle, Fleischmann & Mugel),  Kevin Burke, Bradley Hoppe, (Damon Morey), Eric Bloom, William Savino, Mitchel Banas, (Blair and Roach) (Kazlow and Kazlow) Gene Kazlow, Andrew Lavoot  Bluestone, (Anderson & Anderson), David C. Buxbaum,  (Kloss, Stenger and Lotempio),  Joseph Mazurek, Phil Abromowicz, David Kloss, Michael Paskowitz, (Woods Oviatt Gillman) (Gross, Shuman Brizdle & Gilfillan.)

### Shmueli's Litigation Methods

The purpose of explaining at length the actions of Shmueli is that Shmueli, and not concealment from the IRS, was the sole reason for forming multiple corporations and opening

bank accounts named in the Superseding Indictment. Mr. Parlato was always prepared to show in detail why he opened each account and formed each entity and why he made every transfer.

In short, Mr. Parlato, struggling to make a success out of a very challenging project, in an economically depressed city, was up against what he believed was a psychopathic and criminal litigant.

While Mr. Parlato paid his lawyers to defend him, Shmueli had no such scruples. Court records show Shmueli had unpaid legal fees to at least six law firms for more than $400,000. That was just what was available from court records. Upon information and belief, Shmueli owed other lawyers at least another $200,000.

Shmueli retained Anderson and Anderson of Ghanzou, China, to assist him in crafting creative litigation strategies to persuade his Western New York lawyers to discount fees after they were earned. He ended up failing to pay Anderson and Anderson $60,000. David Buxbaum Esq, of Anderson and Anderson wrote, "Shmueli's emails are completely self-serving, and unfortunately, in light of the Defendants' (Shmueli as proxy for David Ho) notorious nature of not paying their legal fees evidenced through the established record, they constitute crafty attempts to delay payment and artificially create a dispute on an account stated claim in anticipation of litigation."

Shmueli retained New York City malpractice attorney Andrew Lavoott Bluestone just to sue two of his WNY law firms. It took months for Bluestone in two different Courts to get permission to withdraw from representing Shmueli, who refused to consent to his withdrawal even though he had long before stopped paying him.

Bluestone's affidavits show he believed Shmueli was committing fraud on the courts concerning David Ho from Hong Kong, his alleged billionaire client. Bluestone alleged Ho was a phantom since he never once spoke with him.

Shmueli created a series of companies with the same name with different owners in different countries to pursue litigation funding, raising money from private investors, notably from Australia, whom he promised would share in settlements or judgements against Mr. Parlato. In this way, he always had fresh money to retain a new team of lawyers. Shmueli never paid litigation financiers since he never won any settlements or judgements. Since he ultimately failed to pay lawyers hundreds of thousands of dollars, Shmueli appeared to live off of suing Mr. Parlato and losing.

Rochester lawyer Gene Kazlow wrote in a court filing: "The reason why the retainer agreement was revised was that I had learned that certain representations made to me by Mr. Shmueli concerning the status of settlement discussions in the case, on which I had based the compensation structure in the initial agreements, were false."

One Judge wrote Shmuel's "strategy is clear. Unable to claim (he) has complied with this Court's order, (Shmueli) attempt(s) to paint a picture where both sides appear at fault on a number of discovery issues, thus inviting the Court to resolve the motions by proclaiming a 'pox on both your houses.'"

Perhaps most telling of all is one of Shmueli's lawyer's October 18, 2010 attorney certification, made in one of the lawsuits against Mr. Parlato.

"I, ERIC A. BLOOM, ESQ., do hereby certify, under penalty of perjury, that I have no actual knowledge that the substance of any statements of fact contained in the annexed document are false. This Certification is based solely and exclusively upon information provided by the client

[Shmueli] and upon the client's certification to the undersigned attorney that such information is not false and is not based upon any review, audit, examination, inquiry or investigation made by the undersigned attorney or anyone acting on behalf of said attorney…Where the paper is an initiating pleading, (i) the matter was not obtained through illegal conduct, or **that if it was,** the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom.

"Please take further notice that the opposing party may not and should not rely upon this Attorney's Certification in assessing the truth or validity of the information contained in the annexed document. The credibility of this submission is no greater than the credibility of the client (Shmueli) represented by the undersigned attorney and the opposing party should give this document no greater credence because it bears this Attorney Certification."

So in this way, Mr. Parlato always faced a battery of attorneys who would come in zealously, echo Shmueli's allegations against Mr. Parlato, then sooner or later learn the truth about Shmueli, accompanied with a lack of payment, and withdraw.

If some of Mr. Parlato's actions were unusual, he was dealing with an unusual litigator. Unlike Mr. Shmueli, Mr. Parlato paid his lawyers, litigated honestly and fairly, had the seriously responsibility of protecting his businesses and what was most important to him, the protection of the employees and vendors who depended on One Niagara for their livelihood.

It is important to note that Shmueli, who often posed as a Rabbi, could be extremely convincing and was, at all times, dangerous. He once took some of his litigation funding and advertised in the leading Israel media that he was the successor of a late and revered Hasidic Rabbi then called upon Israel to declare war with Iran.

This was not an ordinary litigant and if Mr. Parlato took unusual steps to protect his fledgling business and the men and women who depended on it for their living, it was because he worried that Shmueli was capable of almost anything.

This put Mr. Parlato not only on the defense but since he was not willing to deceive the Courts, in a constant position of defending against Shmueli's disturbing lies.

In order to fend off illegal seizures and attachments, with his attorney's advice, knowledge and consent, Mr. Parlato opened up bank accounts and formed corporate entities. Over a 10 year period, Mr. Parlato formed corporate entities and opened bank accounts with a specific purpose. While the government claimed that was part of a scheme as alleged in the Indictment, Mr. Parlato's actions were never intended to defraud the Internal Revenue Service. Rather, it was to keep the money from Shmueli's reach. As noted, his attorney had knowledge of bank accounts and corporate entities. Those efforts were intended to keep the money from Shmueli.

Mr. Parlato was aware of Shmueli's tactics and background. He knew that Shmueli had opened his own newspaper in Brooklyn but was later sued for plagiarizing work from other newspapers. The newspapers sued and were awarded a $24 million judgment, which Shmueli discharged in bankruptcy. There were other acts by Shmueli which showed Mr. Parlato that he would go to the ends of the earth to do whatever he felt.

One of his most outrageous was concerning a residential property in Brooklyn. Shmueli bought a home in Brooklyn and sold it to his wife, who sold it back to him, who sold it back to his wife, who sold it to his daughter – each time raising mortgage money against the home. His daughter then sold the house to a couple who closed and sought to take possession as agreed in the contract. The couple arrived to move in and found Shmueli living in the house.  He refused to give up possession and told the couple he had a lease to stay in the house from his daughter. The couple

went to the Eastern District of New York and sued for fraud. It took months before US Marshals were ordered to remove him and his possessions. But Shmueli had long ago left for Israel. The couple won a judgment for $50,000 for legal fees, which remains unpaid. While this might qualify as egregious because it involved his Brooklyn family home, his appearance in Israel, according to court filings, at his mother's deathbed and a change in her Will eliminating Shmueli's brother's 50 percent share of her estate in favor of Shmueli pitted bother against brother in a contentious lawsuit.

At One Niagara, Shmueli was just as devious. On August 2, 2009, Shmueli met with Mr. Parlato. He said he wanted to buy out Mr. Parlato. Sitting at a table in the food court with two of his bodyguards, Shmueli learned that Mr. Parlato's attorney, Paul Grenga, was on vacation in Bimini. In answer to Shmueli's seemingly innocuous question, "Wouldn't you like to go to Bimini?," Mr. Parlato answered, "Yes, sure, I would like to go some day."

A few days later, unbeknownst to Mr. Parlato, Shmueli brought a motion for an expedited ex parte hearing on his motion for an order of attachment without notice to Mr. Parlato, in the Western District Of New York, asking the Court to freeze the companies' assets at M&T bank because "Parlato has stated that he is going to… abscond with the proceeds … to the Bimini Islands – beyond the jurisdiction of this Court."

Of course, Mr. Parlato never said he was headed to Bimini with company funds, leave his family, and business to flee the jurisdiction. Mr. Parlato did not even have a valid passport at the time, a requirement to travel to Bimini.

But on September 11, Mr. Parlato got notice of the Court's denial of Shmueli's ex parte motion. Mr. Parlato was shocked and relieved at the same time. Shocked that extensive motion

practice could occur without his knowledge which might have resulted in freezing company assets at M&T Bank. If Shmueli succeeded, he would have crippled the company.

Mr. Parlato asked his lawyers if they thought Shmueli would succeed at getting an attachment. He was told that through forum shopping, and Shmueli's willingness to commit perjury, and with the right attorneys, to give Shmueli the imprimateur of credibility, he might succeed in some Court and that Mr. Parlato would only find out about after he tried to draw a check to pay a bill or make payroll.

Within days of learning about the attachment effort, Mr. Parlato formed four corporations, then opened bank accounts at two local banks for each corporation to deposit money to protect the assets. If Shmueli did not know where the money was, or the company that held the funds, he would be unable to serve subpoenas or make applications for seizure of bank accounts to the courts since the courts required the name of a bank he sought to seize.

He could not merely seek an order of attachment for any bank account at any bank, if he did not know the name of the account holder. The record is clear. The bank accounts alleged to be part of a scheme to impede the IRS were opened in response to outrageous and dishonest legal actions by Shmueli.

Mr. Parlato opened the bank accounts in the names of newly formed corporate entities, but significantly he provided every bank with his name as the owner, his address, and his Taxpayer Identification Number (Social Security Number). The Government has the bank records and provided them in discovery to the defense. There are no exceptions. Every bank account clearly lists Mr. Parlato was the owner of the companies that owned the accounts.

If the case had gone to trial, Mr. Parlato was prepared to show how every corporate entity and bank account was formed or opened within days, if not hours, of one of Shmueli's unprincipled

litigation attacks. Mr. Parlato's actions were not a scheme to impede the IRS. Mr. Parlato's unusual

efforts were made in reaction to a very unusual litigator.

We will quote from Mr. Parlato's letters of support to further show why Mr. Parlato had

cause for concern:

Journalist Tony Farina, wrote:

"[Mr. Parlato] had a long fight on his hands with a totally unscrupulous minority partner

in the One Niagara venture and I think that was the source of a great many of his problems in that

project. He spent a lot of time trying to defend himself from the minority partner who made his

life miserable. Nonetheless, he developed the tourist center without a dime of public assistance

while fighting a ruthless and sneaky partner who spent his every waking hour trying to undermine

Frank's efforts."

Mr. Parlato's lawyer and successor at One Niagara, and Mr. Reger's partner, Paul Grenga

wrote:

"[A] myriad of litigations [were] started by Ho's representative Shmuel Shmueli to rescind

Frank's acquisition of the property (started just after Frank's development efforts first appeared

promising).

"Mr. Shmueli, then appearing to reside outside of the jurisdiction of our courts and without

any assets in the United States, was a serial litigator. He manifested complete disregard of our

sworn oaths. He commenced multiple simultaneous suits with different attorneys in varying

jurisdictions all seeking the same or similar relief. In Shmueli's numerous *ex parte* applications

seeking to seize Frank's business and related bank accounts, some Courts who were unaware of

the other litigations and prior failed motions, verged on granting these fraudulent <u>ex</u>

<u>parte</u> applications as Shmueli's claims became more outrageous and extreme. All of Shmueli's

24

suits were eventually dismissed, however, the high-profile subject matter of the litigation unfortunately resulted in undue news coverage that simply repeated Shmueli's completely unsupported, sensational, and most outlandish claims."

Attorney James Roscetti who represented Mr. Reger and Mr. Parlato against Shmueli writes in a letter of support:

"I had the opportunity to represent [Mr. Parlato] in multiple frivolous lawsuits brought by a serial litigator, [Shmueli] who commenced litigations, with at least ten different attorneys at various times in multiple courts, including Erie County and Niagara County Supreme Court and Federal court. Over the number of years that those litigations were continuing, Frank never lost a case or even a motion, I believe. Ultimately Justice Walker was able to consolidate all open cases and after a trial they were all dismissed ending the multi-years serial attacks. Frank fully participated in those litigations, showed for all depositions, executed affidavits in response to motions, etc., all openly and honest."

**Sale of One Niagara**

In 2010, Shmuel began yet another lawsuit. This time, he sought to have a receiver appointed and oust Mr. Parlato as manager. Mr. Parlato had been contemplating selling. But he refused to sell until the project was a success and legally secure. In July 2010, Mr. Parlato won another hard-fought legal battle, after two state courts denied Shmueli's motion to replace Mr. Parlato with a receiver.

With the renovation of the One Niagara building complete and with business thriving, Mr. Parlato felt One Niagara was on solid ground. The property in five years went from a vacant building with a giant hole to a successful business. Every vendor space was rented and there was a waiting list. Many of the vendors Mr. Parlato installed in One Niagara are still there today.

For instance, Mr. Parlato launched the Gibas family at One Niagara in 2005. The family was extremely successful and have expanded considerably since they first opened with a few tables and sold t-shirts, and with the rumble of trucks coming in and out of the hole with fill. Eighteen years later, the Gibas family is one of the leading souvenir retailers in Niagara Falls. One of the family members, Darren Gibas, wrote in a letter of support:

"I can think of a million times when my family, on every level has gained some benefit from [Mr. Parlato] taking an eyesore and building it up to a working profitable tax generating enterprise. And there are so many families just like mine that owe their successes to Frank….He wanted One Niagara to be a family-oriented place."

Referencing the decline of downtown Niagara Falls and Mr. Parlato's contribution to fighting it, Mr. Gibas added, "I witnessed and watched day after day, year after year. From the late 1990's to date, I know what happened. I know the financial and emotional impact of years of demise of an area. And I know the unbelievable opportunity Frank Parlato single handedly fought to provide to the residents. These opportunities changed the trajectory of our lives, and we benefit still to this day."

As Mr. Farina observed, Mr. Parlato "made [One Niagara] a success which it is today. When he sold it in 2010, it was already a top attraction next to the falls."

Mr. Parlato sold his interest in the building in July 2010, to his attorney, Mr. Grenga, who got some of the purchase money from his new partner, Mr. Reger, who in turn increased his position from 50 percent partner in the lease to a 50 percent partner in the building, increasing his share of the revenues and his equity.

The clear record shows that Mr. Reger not only got an increase in ownership interest, but that while Mr. Parlato and he were partners in Tourist Services LLC, Mr. Reger got every dollar

of his share of the profits. The tax returns were prepared by Mr. Reger and Mr. Parlato's shared accountant who had access to all of Mr. Parlato's bank accounts, every corporate account used to hold money (including those entities formed to protect assets from Shmueli) and every transfer made to any account. Extensive email records show unequivocally that the accountant had all the information and considered these in calculating the tax results. The Government does not dispute the accuracy of the corporate or personal tax returns of Mr. Parlato and, if these are accurate, then the income reported is accurate. The accountant calculated distributions according to the operating agreements allocating to Mr. Reger and Mr. Parlato their proper share as their interest dictated. The tax returns when compared with the controlling operating agreement, show that Mr. Reger received exactly what he bargained for.

As we have indicated, Shmueli did not stop the litigation after Mr. Parlato left One Niagara. In fact, Shmueli even attempted to sue Lawrence Reger for his interest in the property.

Notably, in 2015, during the trial in the last Shmueli lawsuit, in New York State Supreme Court, Mr. Reger, a sworn witness, testified unequivocally that he did not believe that Mr. Parlato had stolen any money from him. He also recognized Mr. Parlato's hard work at managing and developing the property into a successful and profitable venture. Indeed, Mr. Grenga and Mr. Reger, through his death, continued to make significant profits from their interest in the property.

**Post Sale Challenges**

As we indicated, even after the sale, Shmueli continued to sue One Niagara and Mr. Parlato. And as we also indicated, while Mr. Parlato owned One Niagara, and over a period of time, with the acquiescence and knowledge of his attorney, he caused numerous entities (referred to by his attorney as discarded entities) and bank accounts transferring money from one corporate account

to another. His intent was not to hide money from the Internal Revenue Service. It was to keep Shmueli from improperly taking or freezing Mr. Parlato's and the company's assets.

After the sale, Mr. Parlato, still being sued by Shmueli, placed some of his money into his father's IOLA accounts. The banks that held the IOLA accounts were aware that Mr. Parlato's father, Frank Parlato Sr, was the attorney, and account owner of the IOLA accounts. Mr. Parlato and his associate, Chitra Selvaraj were non attorneys whom, at Attorney Parlato's request, the banks authorized to have signatory powers, along with Mr. Parlato Sr., over the IOLA accounts, which had only Mr. Parlato's funds on deposit.

Mr. Parlato's belief, at the time, was that it would be safe from attachment. His mistaken belief was that it was not inappropriate to be a signor. While this does not excuse the error, the mistake was guided by the fact that his father and he asked the banks if it was permissible for an attorney to add a non-attorney signor to his IOLA account. All three banks, Key Bank, Bank of America, and First Niagara, said it was permissible.

To be clear, the IOLA accounts were in Attorney Frank Parlato Sr's name.  Both Mr. Parlato Sr. and Mr. Parlato Jr. disclosed to the banks that Mr. Parlato Jr. and Ms. Selvaraj were non-attorneys. Mr. Parlato and Ms. Selvaraj provided the banks with their social security number. Mr. Parlato Jr.'s money was the only money in the IOLA accounts.

Years later, after Mr. Parlato was indicted, Mr. Parlato Sr. and Mr. Parlato Jr. learned it was an ethical violation for an attorney to permit a non-attorney in New York to be a signer on an attorney's Iola account. The matter was litigated as an attorney misconduct grievance. The New York State Appellate Court heard the matter and, as it was determined that: no one lost any money, there was no comingling of clients' money, there was no attempt to deceive the banks; there was clear disclosure that Mr. Parlato Jr. and Ms. Selvaraj were non-attorneys, (and that everyone

provided his or hers taxpayer identification numbers to the banks), the Appellate Court decided that Mr. Parlato Sr. should receive a private letter of admonition, advising him not to do it again.

But that came years later, after Mr. Parlato was indicted.

Initially, after Mr. Parlato sold his interest in One Niagara in July 2010, he sought new development opportunities. In 2011, he found a suitable project. It promised to be much larger and more challenging than the one he had just successfully developed in Niagara Falls.

**Investigation and Indictment**

In early January 2012, about a year and a half after he sold his interests in One Niagara, and as he was moving forward with his new development plans, Mr. Parlato learned he was under federal investigation. He canceled his development plans since he could not be certain if or when he might be indicted and have to prepare for trial. It took almost four years to indict him.

In order to have a short-term project where he could earn needed income, Mr. Parlato approached his successor at One Niagara, Mr. Grenga, and asked if he would let him develop the outside of One Niagara with retail and food outlets and tours. Mr. Grenga agreed and allowed Mr. Parlato to operate and earn for both of them additional revenue. As the investigation continued for several years, Mr. Parlato operated as an outdoor vendor at One Niagara.

To be clear. Mr. Parlato sold One Niagara to develop new and bigger projects. He did not plan to return to One Niagara after selling his interests there. When Mr. Parlato was owner of One Niagara, he had full control over all operations. Now he managed tents, tables and food stands on one corner of the outside of the property in spring and summer.

Still Mr. Parlato's efforts were successful. But his expenses in legal fees surpassed his summer income. His lifetime of savings were diminishing. Then in the summer of 2015, the Government seized $1 million in three IOLA accounts. He now had little in liquid assets.

In the fall of 2015, to earn income, Mr. Parlato entered into a monthly lease for a restaurant and bar in a low-income neighborhood in Niagara Falls. Mr. Parlato, confident in his culinary skills, became the head chef of his own modest restaurant and he stayed late to manage the the bar.

His landlord was a One Niagara vendor whom Mr. Parlato helped to launch a highly successful tour bus company. On Friday November 20, 2015, Mr. Parlato was indicted, and the landlord of the restaurant and bar canceled Mr. Parlato's lease.

Now under indictment, Mr. Parlato approached Mr. Grenga, who through his courtesy permitted Mr. Parlato to enter into an agreement where Mr. Parlato would be responsible for managing a larger outside area of the One Niagara property. Mr. Parlato remains grateful to Mr. Grenga for permitting him to earn money while awaiting indictment and after the indictment. Again, Mr. Parlato was successful, and it benefited Mr. Grenga and Mr. Parlato.

Once indicted, however, Mr. Parlato's banks soon canceled his accounts. In fact, just at the busiest period of the 2016 tourist season, the July 4th weekend was approaching, and Mr. Parlato had set up a business account to handle credit card machines depositing into the bank account, he received notification from the Bank of America that they were canceling his bank account. He was forced to make last minute arrangements to cancel the credit card charges and had to operate using cash and, at times, with permission, Mr. Grenga's account.

Following the Superseding Indictment, which mentioned that Mr. Parlato paid Mr. Grenga his share of the profits in cash, Mr. Grenga felt, and Mr. Parlato acquiesced, that it was not in the best interest of One Niagara for Mr. Parlato to continue operating there.

**Tax Returns**

In the end, all the money that was paid to Mr. Parlato by Mr. Grenga when he bought the property was reported to the Internal Revenue Service. Mr. Parlato did not hide any profits from

the Internal Revenue Service. While he was often late filing tax returns, he paid his taxes, including late fees, penalties and interest. The Government never charged Mr. Parlato with tax evasion.

While under indictment, Mr. Parlato did not file tax returns. In part he did not file because he owed no taxes and because he was advised that defendants under indictment on a tax case normally do not file tax returns until the case is resolved.

Shortly after Mr. Parlato entered a plea agreement on August 5, 2022, he filed his pending tax returns from 2014-2017. He then went to work on preparing his later tax returns.

As will be seen below, while he was often dilatory in filing his tax returns, they are now filed and, as recognized in the Plea Agreement any money owed to the Internal Revenue Service will have been paid.

Likewise, as Mr. Reger himself recognized, Mr. Parlato did not defraud him nor did he owe any further money to Mr. Reger or his company.

Notably, there has never been a claim by the government that Mr. Parlato ever misrepresented his income in any of the tax returns that he has filed. In other words, Mr. Parlato, while he did not file some of the tax returns in a timely fashion, he accurately reported his income. Mr. Parlato is determined that going forward in his life he will faithfully file his tax returns in a timely manner and regrets not having done so in the past.

For approximately the past 11 years, Mr. Parlato has been financially crippled as result of the many frivolous lawsuits he had to endure, his inability to work on long term projects and the cost of counsel to represent him in United States District Court for the Western District of New York. During that time, he lost both of his parents with whom he had a very close, nurturing relationship and several of his closest friends.

As we have indicated, in 2008 through 2010, Mr. Parlato, with the knowledge of his attorney, decided to form various corporate entities which his attorney designated as "disregarded entities." All of the formation of the company's and creation of bank accounts were done to keep Shmueli from illegally seizing Mr. Parlato's, or the companies' assets. All of the companies and bank accounts were formed in Mr. Parlato's name. Every bank account had his Social Security number on file with the bank and attached to the account. Mr. Parlato was named, individually, as the owner and president of the companies for whom the bank accounts were created. In short, he was not trying to defraud the Internal Revenue Service, he was trying to protect himself and One Niagara from Shmueli illegally finding a way to seize the assets. Simply put, there was no intent to fraud. Neither the corporations nor the bank accounts were created for any illegitimate purpose.

## FILING OF THE TAX RETURNS

The following represents Mr. Parlato's filing of his tax returns:

1. One Niagara, Tourist Services, White Star Returns

    2006 return – filed in 2008
    2007 return – filed in 2008
    2008 return – filed in 2012
    2009 return – filed in 2012
    2010 return – filed in 2012

Mr. Parlato did not own any interest in the corporate entities after 2010, as indicated above. Additionally, there has been no allegation that the tax returns in any way understated corporate income.

2. Personal tax returns:

    2006 return – filed in 2008
    2007 return – filed in 2008
    2008 return – filed in 2013
    2009 return – filed in 2013
    2010 return – filed in 2013
    2011 return – filed in 2013

2012 return – filed in 2014
2013 return – filed in 2014
2014 return – filed in 2022
2015 return – filed in 2022
2016 return – filed in 2022
2017 return – filed in 2022

Because of the pendency of the Indictment, Mr. Parlato determined it would be best to hold off the filing of the individual tax returns. However, we are unaware of any allegation suggesting Mr. Parlato underreported or misstated income. Once again, he understands that he should have timely filed the returns and has made a commitment to filing all future tax returns on time. He has filed the tax returns after settling the case through his Plea Agreement.

## MR. PARLATO'S PERSONAL HISTORY

Mr. Parlato has no previous criminal convictions. Through his writings, he has been able to help other people, some of which help is reflected in the numerous letters we have attached hereto. For the past 11 years, he has lived under criminal charges and the earlier investigation. Instead of doing what he liked best, he was in many ways preoccupied with the charges that were filed against him and will be dismissed.

As we have repeatedly stated in Court and in this memorandum, Mr. Parlato would not have pled guilty to any of the counts in the Indictment. That fact was vital as it controlled the plea negotiations, which took place over much of the summer of 2022. Before that time, Mr. Parlato spent much of his time trying to defend himself, diligently working with counsel to establish his innocence. Simply put, he refused to plead guilty to any counts or allegations in the Indictment.

The government and Mr. Parlato's counsel worked long hours to resolve this case. We estimated the trial would last at least six weeks but more likely over two months. Mr. Parlato could not do many of the things he wanted because of the pending Indictment. Simply put, he was preoccupied with all the work that had to go into his defense.

To resolve the Superseding Indictment, Mr. Parlato, his counsel, and the government entered a Plea Agreement that made sense to all parties. Mr. Parlato would agree to plead guilty to a crime that took place in 2010 for failing to file a Form 8300 reporting that more than $10,000.00 of legitimately obtained money had been collected as cash. As the factual basis contained in the Plea Agreement indicated, Mr. Parlato received the money over time from one of the vendors at One Niagara. Mr. Parlato deposited the money into a local bank account. Because the total amount collected from the Vendor over the course of the summer of 2010 exceeded $10,000.00, it was agreed that Mr. Parlato should have filed an IRS Form 8300. Just as important, as a condition of the plea, the government agreed that the Indictment currently pending would be dismissed at the time of Mr. Parlato's sentence. In other words, Mr. Parlato did not have to admit, nor would he, any of the factual bases contained in the Superseding Indictment.

As the government and Mr. Parlato agreed in the Plea Agreement, "44.A The parties agreed that for tax years 2006 – 2013, the defendant paid approximately $260,614.00 out of the $390,000.00 stated in paragraph 4(e).

This payment already paid well before the indictment establishes that Mr. Parlato reported and paid all appropriate income tax on everything he earned from the operation and the sale of One Niagara from the inception to his payment for the sale.

Mr. Parlato wanted to make it clear through the Plea Agreement that he was <u>only</u> pleading guilty to what was set forth in the Superseding Information. As the government agreed, "the parties agree that the only crime the defendant is pleading guilty to is a violation of 26 USC §7203 and §6050I. The parties agree that the only charge to which the defendant is pleading guilty is a failure to file an IRS Form 8300 in 2010 as set forth in the Superseding Information and factual basis.

In fact, during Mr. Parlato's plea colloquy, he stated:

34

The Defendant: it's my understanding that this is the one and only charge that I am pleading guilty to, which was the failure to file an 8300 form in the year 2010.

The Court:  Mr. Kruly, this is the only charge he's pleading guilty to?

Mr. Kruly:  Correct.

The Court:  The count is contained in the Superseding Information.

The Court:  And the indictment that's pending right now will be ultimately dismissed?

Mr. Kruly:  At the time of sentencing.

The Court:  So there will be no charges pending after this plea?

Mr. Kruly:  That's correct.

Later the plea colloquy, Mr. Parlato, once again stated:

The Defendant:  Yes, I do, with just one question, Your Honor. It is my understanding that there was – – the only charge here is just the – – is written in item D, that there is not numerous – – I'm not admitting to numerous failure to file, just this one instance.

Mr. Greenman:  Judge, we believe that section 4, subdivision D, reflects the allegation in the Superseding Information that he is pleading guilty on one occasion for not having filed an 8300 form because the aggregate of numerous multiple payments exceeded $10,000.00 in cash. That is the only thing he is pleading guilty to and I think the Government would agree.

The Court:  You agree with that, Mr. Kruly?

Mr. Kruly:  Yes, Judge.

## MR. PARLATO'S REQUEST FOR A NON-GUIDELINES SENTENCE

The government has reserved its right to request a sentence of no longer than 24 months. By this Sentence Memorandum, Mr. Parlato respectfully urges the court to fashion a sentence which does not require him to be incarcerated. Simply put, he has toiled under the specter of a

35

soon-to-be dismissed Indictment. Simply put, we believe that Mr. Parlato should be sentenced for the crime to which he pled guilty.

Subsequent to the promulgation of United States Sentencing Guidelines, the United States Supreme Court recognized that more was required then to simply look at the guideline calculations in order to fashion a just and reasonable sentence. The Supreme Court has noted:

> Our post-*Booker* opinions made clear that, although a sentencing court must "give respectful consideration to the Guidelines, *Booker*, permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 552 US 85, 101 (2007). And, while the Guidelines are the starting point to a court's consideration a district court should otherwise impose a sentence within the statutory limits based upon "appropriate consideration of all of the factors listed in §3553(a).

The Supreme Court has also added "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person is an individual and every case as a unique study in the human failings it sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. "*Koon v. United States*, 518 US 81 (1996); *Pepper v. United States*, 562 US 476, 487 (2011). Along those lines, we are respectfully urging the Court to sentence Mr. Parlato to the crime for which he pled guilty: His failure to file an 8300 IRS form when, over a period of time, he deposited legally obtained funds in a bank account.

Additionally, as this Court is aware, Mr. Parlato was scheduled to begin trial in September, 2022. The trial was expected to last between 6 to 8 weeks. It was to be a complicated trial on numerous tax issues. As we have stated in the past, it was Mr. Parlato's intent to vigorously defend the case and provide an active defense showing that he was not guilty of the crimes for which he was charged in the Superseding Indictment. Beginning in early summer, 2022 both the government and Mr. Parlato's counsel begin to engage in serious plea negotiations. One thing was constant

from the defense: Mr. Parlato <u>would</u> <u>not</u> plead guilty to any of the counts contained in the Superseding Indictment.

The negotiations ended in a Plea Agreement which will ultimately lead to the dismissal of each of the counts contained in the Superseding Indictment. In other words, there will be no finding from a jury as to his guilt or innocence. It was Mr. Parlato's hope and expectation that he would be sentenced based upon his plea of guilty. However, the Presentence Report in numerous paragraphs outline the facts which were contained in the Indictment. While, in our hearts, we would like to controvert all of the information, we believe that it would be a waste of this Court's valuable time and resources to have to relitigate that which is being dismissed. Simply put, there is no reason for the defense to have to argue, on a count-by-count basis, why Mr. Parlato was not guilty of the crimes for which he was charged.

Mr. Parlato is almost 68 years old and his health is beginning to diminish as will be set forth below. As well, he has toiled under the cloud of the Superseding Indictment for more than seven years. We believe that punishment has been meted out to him.

Of course, in order to be reasonable, a sentence imposed by a court must be sufficient, but not greater than necessary, to comply with the purposes set forth in Title 18 USC §3553(2). In that regard, we recognize that the sentencing statute first suggests that the court consider the nature and circumstances of <u>the</u> offense and the history and characteristics of the defendant. We have already discussed the offense and we will further discuss the offense to which Mr. Parlato pled guilty below. Additionally, the sentencing statute provides that the court consider:

> (2) the need for the sentence imposed –
>
> > (A) <u>to reflect the seriousness of the offence</u>, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant; and

      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

    (3) The statute also provides that the court should consider

      (A) the kinds of sentences available.

In this case, when considering the significance of the offense to which Mr. Parlato pled guilty, we believe that under the circumstances, no further penal punishment should be imposed.

The PSR indicates that during the summer, and while Mr. Parlato was engaged in the business of One Niagara, Mr. Parlato and others received rental payments from the building's vendors, typically requiring the vendor to pay approximate 25% of the vendors gross revenue as rent.

Paragraph 82 of the Presentence Report correctly indicates, and consistent with the Plea Agreement that:

> The Internal Revenue Code required the defendant to file an IRS Form 8300, when, in the course of operating One Niagara, the defendant received annual cash rent payments in excess of $10,000.00 in one transaction or two or more related transactions. During the time period that he owned and/or managed One Niagara, defendant willfully failed to file IRS Forms 8300 for annual cash rent payments he received from One Niagara's vendors which were in excess of $10,000.00." The Plea Agreement outlines the specific transactions to which Mr. Parlato pled guilty.

In fact, what is important to consider is the fact that the money Mr. Parlato and others received was legally obtained. There was no criminality involved from where the money had been derived. Likewise, all of the money was appropriately deposited into a bank account on behalf of Tourist Services and One Niagara, Mr. Parlato and his partner. Though Mr. Parlato did not file the

38

Form 8300 reporting that the $19,970 was paid in cash in 2010, he did report the $19,970 income on the appropriate 2010 company tax returns and he reported the results of the $19,970 after expenses on his 2010 personal tax returns and paid the appropriate taxes on it, well before the indictment, evidencing he had no intention to evade taxes or conceal the money.

The Government does not dispute that Mr. Parlato reported the $19,970 collected in cash on his tax returns. It is acknowledged in the Plea Agreement that Mr. Parlato has no (zero) unpaid taxes for 2010. The Government also acknowledges that Mr. Parlato, although he filed and paid late at times, did report and pay taxes for every dollar the One Niagara project generated, including the proceeds of Mr. Parlato's sale to Mr. Grenga. This is evidenced in the Plea Agreement by the Government in a chart which shows that for the years 2006-2013, Mr. Parlato owes no (zero) taxes. Mr. Parlato paid more than $260,000 in income taxes representing his tax liability for the project and this was paid more than two years before the indictment in 2015.

To be clear, Mr. Parlato developed a successful project, earned money from it, and paid all the taxes he owed more than nine years ago, leaving no stain on an otherwise successful project which he undertook and completed.

. Once again, there was only one crime to which Mr. Parlato pled guilty – the failure to file Form 8300. This crime was not, in any way, intended by Mr. Parlato to deceive the IRS from collecting its rightful taxes.

That is the extent of the crime to which Mr. Parlato pled guilty and we respectfully urge the Court to consider the fact that it was Mr. Parlato's understanding that that crime would be the basis for his ultimate sentence.

Mr. Parlato was earnest about his denial of every allegation in the Superseding Indictment. On the morning of his entering his plea, Mr. Parlato insisted that the Plea Agreement reflect this.

He asked for and the government consented to make handwritten amendments to the Plea Agreement, which clarified that the only charge he pled guilty to was a single failure to file form 8300 in 2010 failing to report $19,970 came in cash, and that he paid the full taxes on the $19,970, along with the fact that he fully paid all taxes for every year he owned One Niagara.

He also sought to have paragraph #6 of the originally drafted plea agreement struck. Paragraph #6 stated that Mr. Parlato agreed that the sentencing guidelines were to be calculated "as if" he had been convicted of a Section 371, [Klein Conspiracy.]

Mr. Parlato felt that even though a Klein Conspiracy was not a crime of conviction, he had spent more than seven years under indictment for these charges. The Klein Conspiracy allegations took up 20 of 25 pages of the charges recited in the Superseding Indictment. He adamantly denied this charge as false for more than seven years. He did not want the Court to calculate his sentencing guidelines "as if" he had been convicted of a crime which he did not commit and one that he finds morally reprehensible.

In fact, on the morning of the Plea, on August 5, Mr. Parlato stated that he would never sign the Plea Agreement and face trial if Paragraph #6 was not stricken. He instructed his attorneys to inform the Court he would stand trial

**Amendments to Plea Agreement**

Mr. Parlato and the Government agreed to strike out Paragraph #6 of the Plea Agreement.

Para #6, stated that "Pursuant to the Sentencing Guidelines 1B1.2[a] the government and the defendant agree that the defendant's sentencing range for imprisonment and a fine shall be determined *as if* the defendant was convicted of a violation of Title 18, United States Code Section 371." (Emphasis added.)

40

Title 18, United States Code Section 371, also known as a Klein Conspiracy, formed a substantial part of the original and the Superseding Indictment, which will be dismissed at the time of sentencing.

Mr. Parlato insisted Para #6 be stricken, because he adamantly denies he engaged in a 371 conspiracy and was unwilling to have sentencing guidelines calculated based on conduct he never engaged in.

He stated during the morning of the plea negotiations on August 5, 2022, that he was prepared to go to trial rather than sign a Plea Agreement with the 371 Klein Conspiracy language in the agreement and refused to agree to have Sentencing Guidelines calculated "as if" he committed a crime he never did.

In addition to striking #6, Mr. Parlato and the Government' agreed to add amendment 44a and 44b to the Plea Agreement, which further clarified that Mr. Parlato was pleading guilty to only one offense of failing to file one IRS 8300 form in 2010.

The amendments clarified that most [67 percent] of the tax loss calculated by the government was already paid. Mr. Parlato paid more than $260,000 in taxes by 2013, two years before the first indictment, and more than nine years ago.

The remaining tax loss, calculated by the government as approximately $130,000, represents the government's estimated taxes due in the year of his indictment and the years after his indictment, the tax years of 2014-2017.

Paragraph 44A reads. "The parties agree that for tax years 2006 through 2013, the defendant paid approximately $260,614 out of the $390,346 stated in paragraph 4a.'

Paragraph 44 B. reads, "The parties agree that the only crime the defendant is pleading guilty to is a violation of 26 USC section 7203 and Section 6050(i). The parties agree that the only

charge to which the defendant is pleading guilty is a failure to file an IRS Form 8300 in 2010 as set forth in the Superseding Information and factual basis."

Again, during the Plea Colloquy, Mr. Parlato asked the Court repeatedly if he correctly understood the Plea Agreement and that it was true that he was pleading only to the single crime of conviction, a one-time failure to file Form 8300 in 2010 for his failure to report that $19,970 was paid in cash.  The Court asked the Government and got the confirmation that this was correct.

Nevertheless, we have, to the extent necessary, responded to some of the suggestions in the Presentence Report. For the most part, the information provided by the probation department to the Court in the Presentence Report is information which came directly from the Indictment itself. We hope that the Court will take note of the fact that Mr. Parlato strenuously maintained his innocence to all of those allegations.

As to the other factors set forth in 18 USC §3553(a), we believe that a sentence imposed by the Court, taking into consideration the fact that Mr. Parlato has been under indictment and living with the threats from the allegations in the indictment are sufficient for the Court to consider them as just punishment and a recognition of the seriousness of the offense.

Relative to other factors contained in the statute, there is little doubt but that the public does not need to be protected from any potential further crimes which would otherwise be committed by Mr. Parlato and that he does not need additional education or vocational training, specified medical care or other correctional treatment in the most effective manner. The kinds of other sentences which are available certainly include a sentence which would justify a non-incarceration type of sentence.

In a letter written by Dr. Robert L. Oksenholt, D.O., he has noted that Mr. Parlato, at his advanced age, now suffers from a potential heart conditions and diabetes. To Mr. Parlato's surprise,

these are factors which have recently been detected and of which he was previously unaware. Dr. Oksenholt has urged the Court not to sentence Mr. Parlato to jail based upon various factors. While it is true that he may be able to be treated while at a Bureau of Prison facility, the potential for contracting Covid-19 is certainly greater in a penal institution than it otherwise may be. For those reasons, we believe that while it may be treated medically in a BOP facility, other risks involved should better be treated outside of a jail facility.

In the end, Mr. Parlato has paid  a serious price for his crime of conviction for not filing the Form 8300. He has been convicted of a felony which is not inconsequential. He has lived for over 11 years either facing investigation or indictment for crimes that he was adamant that he did not commit. In fact, the Indictment itself will be dismissed.

Additionally, we have attached numerous letters which counsel has received on Mr. Parlato's behalf. Those letters are filled with acts of kindness, charity and benevolence to others less fortunate than him.  Likewise, he has always been available for people in need. His guidance in counseling through the years to so many individuals perhaps tells more whom he is than from any other source.

At this point, Mr. Parlato strives to reclaim his life which was lost over the past 11 plus years. His involvement with the One Niagara project was tireless and he left the project successful and it continues to be a success, operating for the benefit of the community, the owners, the tenants and vendors (many of whom he established more than a decade ago) the employees, and tourists who come to visit Niagara Falls. From an abandoned building to a successful project, the business at the heart of the case was not a failure but a success.

In the end, Mr. Parlato started by trying to rebuild a structure which could prove productive not only for himself and Mr. Reger but for the people of Niagara Falls. As noted in Paul Grenga's

letter to the Court, he was responsible for adding over 100 jobs to a depressed economy.  He has caught up with tax return filings and will continue to timely file in the future.

We ask the Court to consider all of the foregoing in fashioning a just and appropriate sentence to a man who has done so many good things in his life for other individuals.  As a result, we ask the Court to sentence Mr. Parlato accordingly.


/s/Paul J. Cambria, Jr.
Paul J. Cambria, Jr.